# BANK OF AMERICA EQUITY MAXIMIZER AGREEMENT
# AND DISCLOSURE STATEMENT

**Property Serving as Security (the "Property"):** 295 GEMINI DR UNIT 3B, HILLSBOROUGH TWP, SOMERSET, NEW JERSEY 08844-4976
**Borrower's Name and Address:** SANIYE F MUFTUOGLU, 295 GEMINI DR UNIT 3B, HILLSBOROUGH, NEW JERSEY 08844-4976

**Lender's Name and Address:** Bank of America, NA, National Banking Association, 100 North Tryon Street, Charlotte, North Carolina 28255

| | | |
|---|---|---|
| **Date:** JULY 20, 2007 | **Annual Percentage Rate:** 9.4900 | **Draw Period:** 120 Mos. |
| | **Margin:** 1.2400 | **Repayment Period:** 180 Mos. |
| **Maturity Date:** JULY 20, 2032 | **Max. Interest Rate:** 24.0000 | **Billing Cycle:** MONTHLY |
| **Credit Limit:** $ 64,000.00 | | |

1. **Introduction.** This Bank of America Equity Maximizer Agreement and Disclosure Statement ("Agreement") governs your Home Equity Line of Credit Account (your "Credit Line" or "Account") with the lender named above ("Lender"). Your Account is a revolving credit arrangement in which we make loans to you by advancing funds ("Advances") at your direction, allowing you to repay those Advances and take additional Advances, subject to the terms of this Agreement. This Agreement will remain in full force and effect notwithstanding that the Account Balance under the Agreement may occasionally be reduced to an amount equal to or less than zero.

In this Agreement, the terms "we," "us," "our" and "Bank" refer to the Lender or to any subsequent assignee or transferee. Except as noted below, the terms "you," "your," "yours" and "Borrower" refer to each person that signs this Agreement or has authority to use the Credit Line. Read this Agreement carefully so that you know how your Account works and keep a copy of this Agreement for your records.

2. **Borrower's Promise to Pay.** You promise to pay to Lender the total of all Advances plus **FINANCE CHARGES**, together with all fees and charges under the terms of this Agreement. You will pay your Account according to the terms set forth below. If there is more than one Borrower, each is jointly and severally liable on this Agreement. This means we can require any Borrower to pay all amounts due under this Agreement, including credit advances made to any Borrower. Each Borrower authorizes any other Borrower, on his or her signature alone, to cancel the Credit Line, to request and receive credit advances, and to do all other things necessary to carry out the terms of this Agreement. We can release any Borrower from responsibility under this Agreement, and the others will remain responsible.

3. **Term.** The term of your Account will begin as of the date of this Agreement ("Opening Date") and will continue until all indebtedness under this Agreement, if not already paid pursuant to the payment provision below, will be due and payable upon maturity. The Draw Period of your Account will begin on the date after the Opening Date, when this Agreement is accepted by us in the State of North Carolina, following the perfection of the Security Instrument and the meeting of all of our other conditions and will continue for one hundred and twenty (120) months. You may obtain credit advances during the Draw Period. After the Draw Period ends, the Repayment Period will begin, and you will no longer be able to obtain credit advances. The length of the Repayment Period is one hundred and eighty (180) months depending on the repayment schedule set forth below. You agree that we may renew or extend the period during which you may obtain credit advances or make payments.

4. **Credit Limit.** This Agreement covers a revolving line of credit for the principal amount of SIXTY-FOUR THOUSAND AND 00/100 DOLLARS ($64,000) which will be your Credit Limit under this Agreement.

You may not request an Advance from your Account that would cause your outstanding balance of Advances to exceed your Credit Limit nor are we obligated to pay any Advance request that would cause your outstanding balance of Advances to exceed your Credit Limit. If we do make an Advance that causes your outstanding balance of Advances to exceed your Credit Limit, this will not constitute an increase in your Credit Limit. You agree to immediately repay the amount by which your outstanding balance of Advances exceeds your Credit Limit.

5. **Security.** All amounts due under the Account are secured by a mortgage, deed of trust, or security deed ("Security Instrument") on the Property identified on page one of this Agreement. Borrower agrees to pay all amounts due, and perform all covenants and obligations required of Borrower under the Security Instrument. If it becomes necessary for us to advance funds to you above the Credit Limit to protect our security interest, those amounts in excess of the Credit Limit will be owed by you and will be secured by the Security Instrument unless Applicable Law prohibits the same. The Security Instrument and this Agreement are related documents and a default under either document will be treated as a default under both documents. To the extent permitted by Applicable Law, the lien of the Security Instrument will continue and will have the same priority if, with your consent, we renew, extend, amend, modify or substitute this Agreement. In such event, you agree to execute any additional documents necessary to achieve the action being taken.

6. **Terms And Definitions.** The following terms are defined as set forth in this Section. Other terms are defined elsewhere in this Agreement.
   A. **"Billing Cycle"** is an interval of time that occurs regularly during the term of this Agreement and is used to determine the **FINANCE CHARGES** and other fees, charges, and credit insurance premiums that are due on your Account. The number of days in each Billing Cycle may vary from time to time. A Billing Cycle occurs regardless of whether there is a balance or any activity on your Account. Your Billing Cycle is stated on page 1 of this Agreement.
   B. **"Billing Statement"** is a statement that we will furnish to you periodically that provides important information regarding your Account activity.
   C. **"Credit Limit"** is the maximum aggregate amount of principal that we will extend to you under this Agreement. Your Credit Limit may change under certain circumstances. Your Credit Limit is stated on page 1.
   D. **"Draw Period"** is the period of time during which you may request Advances from your Account. The Draw Period is stated on page 1.
   E. **"Maturity Date"** is the date on which the entire Account Balance under this Agreement is due. The Maturity Date of your Account is stated on page 1.
   F. **"Minimum Payment"** is the minimum amount you must pay on your Credit Account, as reflected on each periodic Billing Statement for each Billing Cycle. Your Minimum Payment during the Draw Period and during the Repayment Period will be calculated as described below under the heading "Payments."

SANIYE F MUFTUOGLU /

    **G.**    **"Outstanding Balance"** is the new balance of the Account, which includes, if applicable, principal, accrued interest on the outstanding principal, fees and charges, Property Expenses and any voluntary insurance, Borrowers' Protection Plan, or Line Protection™ Plan.

    **H.**    **"Property Expenses"** are expenses we incur because you do not fulfill all obligations of the Security Instrument for the Property that secures this Account.

    **I.**    **"Repayment Period"** is the period of time that begins at the end of the Draw Period. During the Repayment Period, you may no longer request Advances from your Account.

    **J.**    **"Variable Rate Balance"** is the balance during the Draw Period that equals the Outstanding Balance that is not part of a Fixed Rate Loan Option.

    **K.**    **"Variable Rate Principal Balance"** is the principal balance that is not payable under a Fixed Rate Loan Option.

**7.**    **Payments.**

    **A.**    **During the Draw Period.** During the Draw Period, the Total Minimum Payment Due is equal to the sum of: (1) the Variable Rate Balance Minimum Payment (described below); (2) the payment due, if any, for any outstanding Fixed Rate Loan Option; and any past due amounts from prior Billing Cycles. Some Fixed Rate Loan Options may have a different due date and are not figured into the Total Minimum Payment Due. At any time you may pay more than the Total Minimum Payment Due, make additional payments or pay in full or in part the Outstanding Balance. You will be required to pay the Minimum Payment Due each month there is an Outstanding Balance on your Account.

    You may choose any of the following monthly payment options. Your billing statement will reflect the option you have chosen. You may change your Draw Period payment option at a later time.

    **B.**    **Variable Rate Balance Minimum Payment.** Your **"Variable Rate Balance"** is all of your Outstanding Balance that is not part of a Fixed Rate Loan Option. Depending on which payment option you choose for the Draw Period, the Variable Rate Balance Minimum Payment may vary. The Variable Rate Balance Minimum Payment will not be less than the amount of accrued interest and any voluntary insurance, plus any unpaid fees.

    **1.**    **Payment Options:**

    **a. Interest Only (Plus Insurance) Option** - The Minimum Payment if you elect the Interest Only (Plus Insurance) Option will be the amount of accrued interest plus any voluntary insurance, and unpaid fees.

    **b. 1.5% of Variable Rate Outstanding Balance Option** - The Minimum Payment if you elect the 1.5% of Variable Rate Outstanding Balance Option will be one and one half percent (1.5%) of the Variable Rate Outstanding Balance plus unpaid fees, or fifty dollars ($50), whichever is greater, or the outstanding Variable Rate Balance if less than the Minimum Payment under this option.

    **c. Fixed Payment Option.** The Minimum Payment if you elect the Fixed Payment Option will be at least one and one half percent (1.5%) of the Credit Limit plus any voluntary insurance, Line Protection™ Plan and unpaid fees, or fifty dollars ($50), whichever is greater, or the outstanding Variable Rate Balance if less than the Minimum Payment under this option.

    **C.**    **During the Repayment Period.** During the Repayment Period you will be required to make a payment each month. The length of Repayment Period will vary depending on the Outstanding Balance at the beginning of the Repayment Period, if any Property Expenses are incurred during the Repayment Period, and if you have any Fixed Rate Loan Options. The amount of the Total Minimum Payment due may vary due to increases or decreases in the Index or if there are any Fixed Rate Loan Options that remain unpaid at the beginning of the Repayment Period.

    Payments during the Repayment Period will be calculated as follows. The Total Minimum Payment Due will be an amount equal to the greater of 1/180th of the Variable Rate Principal Balance remaining on the last date of the Draw Period, plus accrued interest, unpaid fees, unpaid Property Expenses, or fifty dollars ($50). If there are any Fixed Rate Loan Options that remain unpaid at the start of the Repayment Period, the Fixed Rate Loan Options payment previously established will continue to be billed.

    For purposes of this Repayment Options section, the Variable Rate Principal Balance equals the amount of your Credit Limit on which you have not elected to convert to a Fixed Rate Loan as of the start of your Repayment Period.

    **D.**    **Fixed Rate Loan Option Payment Information.** A Fixed Rate Loan Option has a fixed interest rate and fixed term and is payable monthly. You may convert part or all of the Variable Rate Principal Balance, along with accrued interest, fees, and any voluntary insurance charge to a Fixed Rate Loan Option at any time during the Draw Period or the Repayment Period unless you are in default or if your Advance privileges are suspended or terminated. We will help you establish the amount of principal and interest sufficient to amortize the Fixed Rate Loan Option over the term you select. The maximum term of any Fixed Rate Loan Option may not exceed the repayment period maturity date of this Credit Line. The minimum amount for a Fixed Rate Loan Option is $5,000. You may have up to three (3) Fixed Rate Loan Options open at any one time, but may not have more than four (4) Fixed Rate Loan Options open during any one statement period. The Fixed Rate Loan Option ANNUAL PERCENTAGE RATE is the Prime Rate plus the Fixed Rate Loan Option margin of 8.00%. However, we may make lower Fixed Rate Loan Option rates available from time to time. Please contact your Banking Center or Customer Service for the Fixed Rate Loan Option rate currently offered. Your payment will be a fixed dollar amount to be determined at the opening of the Fixed Rate Loan Option. You may arrange a different payment date for each Fixed Rate Loan Option. Fixed Rate Loan Option payments will be billed separately from your Regular Payment in accordance with the schedule you have arranged. For Fixed Rate Loan Options, you will receive a separate bill. However, the Variable Rate Balance statement will show all activity, including payments.

**8.**    **Receipt of Payments and Payment Application.** All payments made by check, automatic account debit, electronic funds transfer, money order, or other instrument must be received by us at the remittance address on your periodic Billing Statement. Payments received at that address prior to 2:00 PM at the location specified, or a payment made at one of our banking centers in the state or our address indicated as the remittance address by 2:00 PM on any business day will be credited as of the date received. Business days are Monday through Friday, exclusive of legal holidays. If the due date falls on a Saturday, Sunday, or legal holiday, the due date will not be extended. Unless otherwise agreed or required by applicable law, payments and other credits will be applied to FINANCE CHARGES, other charges and fees, and principal in any order we choose without notice.

**9.**    **Advances.** During the Draw Period, you may request Advances from your Account, and any amounts you repay will subsequently be available for Advances, subject to the limitations of this Agreement. If there is more than one of you, each of you may obtain Advances in accordance with the terms of this Agreement. Each of you is individually responsible for payment of the entire Account Balance regardless of who actually requested the Advance.

    If there is more than one person authorized to use this Credit Line, you agree not to give us conflicting instructions, such as one Borrower telling us not to give advances to the other.

    The words **"Authorized Signer"** on Special Convenience Checks and Bank of America ATM cards or Bank of America Check Card or Account Access cards as used in this Agreement means and includes each person who (a) signs the application for the Credit Line, (b) signs this Agreement, or (c) has executed a separate signature authorization card for this Credit Line.

    You may obtain Advances under your Credit Line Account as follows.

    **A.**    **Credit Line Checks.** Writing a preprinted **"Special Convenience Check"** that we will supply to you.

SANIYE F MUFTUOGLU

BANK OF AMERICA EQUITY MAXIMIZER AGREEMENT AND DISCLOSURE STATEMENT
USHEAG.BOA 09/12/05 005 DOCMAGIC, INC.    Page 2 of 10    *DocMagic* **ƏFSOTSTƏTS** 800-649-1362
www.docmagic.com

**B. Telephone Request.** Requesting a credit advance from your Account to be applied to your designated account by telephone upon proper identification and in accordance with procedures established by us. Except for transactions covered by the federal Electronic Fund Transfers Act and unless otherwise agreed in your Deposit Account Agreement, you acknowledge and you agree that we do not accept responsibility for the authenticity of telephone instructions and that we will not be liable for any loss, expense, or cost arising out of any telephone request, including any fraudulent or unauthorized telephone request when acting upon such instructions believed to be genuine.

**C. Requests in Person.** Requesting a credit advance in person at any of our authorized locations.

**D. Automated Teller Machine ("ATM") Access.** (Not available in CT, ID, NY, WA or TX) Using your "Bank of America ATM card or Bank of America Check Card or Account Access Card" at any of our designated ATM locations to withdraw or transfer funds in excess of the available collected balance in the account.

**E. Bank of America Equity Maximizer VISAAccount Access Card (the "Account Access Card").** (Not available in CT, ID, NY, WA, or TX) Using the Account Access Card as described in this Agreement. Visa is a registered trademark of Visa International Service Association.

**F. Online Banking.** Transferring funds to a deposit account.

**G. Limitations on the Use of Checks.** We reserve the right not to honor Special Convenience Checks in the following circumstances:

    **1. Credit Limit Violation.** Your Credit Limit has been or would be exceeded by paying the Special Convenience Check.

    **2. Post-dated Checks.** Your Special Convenience Check is post-dated. If a post-dated Special Convenience Check is paid and as a result any other check is returned or not paid, we are not responsible.

    **3. Stolen Checks.** Your Special Convenience Checks have been reported lost or stolen.

    **4. Unauthorized Signatures.** Your Special Convenience Check is not signed by an "Authorized Signer" as defined below.

    **5. Termination or Suspension.** Your Credit Line has been terminated or suspended as provided in this Agreement or could be if we paid the Special Convenience Check.

    **6. Other Special Convenience Check Limitations.** You may not make a payment on the Account with a Special Convenience Check. You notify us that you wish to stop payment of a Special Convenience Check; however, you will not hold us liable if we try to stop payment of Special Convenience Check and we are unable to do so. You may try to stop payment on a Special Convenience Check by notifying Customer Service at the number listed on your statement. Your stop payment order will remain in effect for six (6) months unless renewed.

If we pay any Special Convenience Check under these conditions, you must repay us, subject to applicable laws, for the amount of the Special Convenience Check. The Special Convenience Check itself will be evidence of your debt to us together with this Agreement. Our liability, if any, for wrongful dishonor of a check is limited to your actual damages. Dishonor for any reason as provided in this Agreement is not wrongful dishonor. We may choose not to return Special Convenience Checks along with your periodic Billing Statements; however, your use of each Special Convenience Check will be reflected on your periodic statement as a credit advance. We do not "certify" Special Convenience Checks drawn on your Credit Line.

**H. Limitations on the Use of ATM Cards.** We reserve the right not to honor the Bank of America ATM card or Bank of America Check Card or Account Access Cards in the following circumstances:

    **1. Credit Limit Violation.** Your Credit Limit has been or would be exceeded by honoring the Bank of America ATM card or Bank of America Check Card or Account Access Card charge.

    **2. Stolen ATM Cards.** Your Bank of America ATM card or Bank of America Check Card or Account Access Cards have been reported lost or stolen.

    **3. Termination or Suspension.** Your Credit Line has been terminated or suspended as provided in this Agreement or could be if we honored the Credit Line charge.

    **4. Other ATM Card Limitations.** If we pay any Advance requested by use of the Bank of America ATM card or Bank of America Check Card or Account Access Card under these conditions, you must repay us, subject to applicable laws, for the amount of the Advance. The Advance itself will be evidence of your debt to us together with this Agreement. Our liability, if any, for wrongful dishonor of an Advance is limited to your actual damages. Dishonor for any reason as provided in this Agreement is not wrongful dishonor. Your use of the Bank of America ATM card or Bank of America Check Card or Account Access Card will be reflected on your periodic statement as a credit advance.

**I. Transaction Requirements for Account Access Card.** The following transaction limitations will apply to the use of your Credit Line:

    **1. Account Access Card Limitations.** The following transaction limitations will apply to your Credit Line and accessing by other methods.

    **2. Limitations on the Use of Account Access Card.** We reserve the right not to honor the Account Access Card linked to this Credit Line in the following circumstances.

        **a. Credit Limit Violation.** Your Credit Limit has been or would be exceeded by paying the Account Access Card transaction.

        **b. Stolen Account Access Card.** Your Account Access Card has been reported lost or stolen.

        **c. Unauthorized Signatures.** Your Account Access Card is not used by a Borrower who has been issued one.

        **d. Termination or Suspension.** Your Credit Line has been terminated or suspended as provided in the Agreement or could be if we paid the Account Access Card transaction.

    **3. Other Account Access Card Limitations.** If we pay any Advance requested by use of the Account Access Card under these conditions, you must repay us, subject to applicable laws, for the amount of the Advance. The Advance itself will be evidence of your debt to us together with this Agreement. Our liability, if any, for wrongful dishonor of an Advance is limited to your actual damages. Dishonor for any reason as provided in this Agreement is not wrongful dishonor. Your use of the Account Access Card will be reflected on your periodic statement as a credit advance.

    **4. Liability for Unauthorized Account Access Card Transactions.** You are not liable for unauthorized use of your Account Access Card. Notify us promptly if you believe your Account Access Card has been lost or stolen or if you discover any unauthorized transactions. We may require you to provide a written statement regarding claims of unauthorized Account Access Card transactions.

    **5. Limitations on Lender's Liability.** Lender's liability, if any, for wrongful dishonor of any Advance request is limited to Borrower's actual damages. Lender shall not be liable if any merchant, financial institution or ATM refuses to honor the Account Access Card.

**J. Lost Special Convenience Checks and Bank of America ATM card or Bank of America Check Card or Account Access Cards.** If you lose your Special Convenience Checks or Bank of America ATM card or Bank of America Check Card or Account Access Card(s) or if someone is using them without your permission you agree to let us know immediately. You can notify us at our address shown at the beginning of this Agreement.

**K. Future Credit Line Services.** Where permitted by applicable law, your application for this Credit Line also serves as a request to receive any new services (such as access devices), which may be available at some future time as one of our services in connection with this Credit Line. You understand that this request is voluntary and that you may refuse any of these new services at the time they are offered. You further understand that the terms and conditions of this Agreement will govern any transactions made pursuant to any of these new services.

---

L.    **Credit Line Special Convenience Check, Telephone Request, In Person Request and ATM Access Limitations.** There are no transaction limitations for the writing of Special Convenience Checks, requesting an Advance by telephone, requesting an Advance in person, or using the ATM.

**10.    Billing Statements.** If you have a balance owing on your Account or have any Account activity, we will send to you a Billing Statement. Billing Statements will show, as applicable, credit advances, FINANCE CHARGES, other charges, payments made, other credits, your previous balance, and/or your new balance. Payments will be due as shown on the Billing Statements.

**11.    Automatic Payment.** If you choose to have payments made from a designated account and have arranged with us to do so, we will automatically draft the payment. Drafts will be made on the payment due date or immediately after the payment due date (if the payment due date is on a Saturday, Sunday or legal holiday). If your account does not contain the payment amount due, you understand that it is your obligation without notice from us to make the full payment. Even if you make a manual payment, an automatic payment will be drafted from your designated account, unless you make such manual payment for the full payment due at least three (3) business days prior to the due date; however, if you make less than a full manual payment at least three (3) business days prior to the due date, only the remaining amount currently due will be drafted. To stop an automatic draft, you must contact us at least three (3) business days prior to the scheduled payment draft date. We may accept late payments, partial payments or checks and money orders marked "payment in full" (or similar notations) or payments accompanied by a letter stating that our acceptance of the payment indicates our agreement to the terms set forth in the letter without giving up, waiving or losing any of our rights under law or under this Agreement.

If you have authorized automatic payment above, then the following shall apply:

You hereby authorize the Bank to draft the described account for your loan payments. You agree to the Recurring Automatic Payment Authorization Terms and Conditions that will be enclosed with your Automatic Payment confirmation notice, unless you otherwise notify Lender. If you choose to establish automatic payment to draft your designated Bank of America account, the authorization will remain in full force and effect until the Bank has received written or verbal notification from you of its termination in such time and in such manner as to afford the Bank a reasonable opportunity to act on it. If at any time you select to terminate your automatic payment, your margin will increase by 1/4%.

**12.    ANNUAL PERCENTAGE RATE AND FINANCE CHARGE.**

**A.    When FINANCE CHARGES Begin to Accrue.** Periodic FINANCE CHARGES for Advances under your Credit Line will begin to accrue on the date Advances are posted to your Credit Line. There is no "free ride" period which will allow you to avoid FINANCE CHARGES on your Credit Line Advances.

**B.    How the Balance on which the FINANCE CHARGE is Calculated is Determined.** The cost of the credit through the Credit Line is disclosed as a Finance Charge. Except for some closing costs (indicated in this Agreement), interest will not accrue until a credit advance is made. You will pay interest on each credit advance until it is fully paid off. We will determine the FINANCE CHARGE for each monthly billing period by using the following simple interest rate calculation. A FINANCE CHARGE is calculated daily on the Variable Rate Principal Balance, as defined above in the "Definitions" section of this Agreement, by multiplying the daily periodic rate (as indicated in "How The Rate Used To Calculate The Finance Charge Is Determined ") by the daily Variable Rate Principal Balance.

To get the daily Variable Rate Principal Balance we (i) take the beginning Variable Rate Principal Balance for that day (ii) add to that amount all credit advances and sums advanced by us to fulfill any obligations under a Security Instrument (such as a mortgage, deed of trust, or security agreement), if any, for that day, then (iii) subtract all principal balance payments and credits for the Variable Rate Principal Balance for that day. All of the daily Variable Rate Principal Balance FINANCE CHARGES for the monthly billing cycle are added together to get the total Variable Rate Principal Balance FINANCE CHARGE for the monthly billing cycle. Transaction charges are added to the Variable Rate Principal Balance FINANCE CHARGE to get the total FINANCE CHARGE for the monthly billing cycle. For Fixed Rate Loan Option balances, the estimated FINANCE CHARGE is calculated at the establishment of the Fixed Rate and is included in the fixed payment amount.

**C.    How the Rate Used to Calculate the FINANCE CHARGE Is Determined.** The initial Variable Rate Principal Balance daily periodic rate used to compute the Variable Rate Principal Balance FINANCE CHARGE is 1/365th of the initial Variable Rate Principal Balance ANNUAL PERCENTAGE RATE (as indicated under "Periodic Rate and Corresponding ANNUAL PERCENTAGE RATE"). The Variable Rate Principal Balance ANNUAL PERCENTAGE RATE is a variable rate involving both an index and a margin, both described under "Periodic Rate and Corresponding ANNUAL PERCENTAGE RATE" below. FINANCE CHARGES will accrue on an actual 365-day year basis (366 day year basis for leap year). If, however, you participate in a relationship account with a Bank of America Corporation affiliate (as offered from time to time), the Variable Rate Principal Balance Daily Periodic Rate and the Variable Rate Principal ANNUAL PERCENTAGE RATE may be reduced below the rates stated in this Agreement. The addition of a fee may cause the actual Variable Rate Principal Balance ANNUAL PERCENTAGE RATE for the monthly billing cycle to exceed the Variable Rate Principal Balance ANNUAL PERCENTAGE RATE stated in this Agreement.

If the Index is unavailable for any monthly billing cycle, we will use the Index for the most recently preceding monthly billing cycle in which the Index was available. If the Index ceases to be published during the term of this Agreement, we will select a substitute index and margin. The substitute index will be a historical movement substantially similar to the Index, and the substitute index and margin will result in an ANNUAL PERCENTAGE RATE at the time it is substituted that is substantially similar to the rate in effect at the time the Index became unavailable.

There is no limitation on the size of any interest rate adjustment or the number of interest rate adjustments that may be made on the Credit Line so long as the maximum ANNUAL PERCENTAGE RATE is not exceeded. Any increase or decrease in the Index that occurs would cause a corresponding increase or decrease in the Daily Periodic Rate, ANNUAL PERCENTAGE RATE, FINANCE CHARGES and possibly the Total Minimum Payment Due. You understand that adjustments based on an Index change will be applied automatically to the Credit Line and you will not receive advance notice of that adjustment.

The Finance Charge on a Fixed Rate Loan Option is determined on a simple interest basis. If you make a Fixed Rate Loan Option payment(s) before or after any date, either the amount of your originally scheduled final payment may be lower or higher than the amount initially established or additional payment(s) may be required.

Under some circumstances, your payment will not cover the FINANCE CHARGES that accrue and negative amortization will occur. Negative amortization will increase the total amount you may pay us and reduce the equity in the Property.

**13.    Periodic Rate and Corresponding ANNUAL PERCENTAGE RATE.** We will determine the Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE as follows. We start with an independent index, which is the Prime Rate as published daily in the "Money Rates" table of *The Wall Street Journal* (the "Index"). When a range of rates has been published, the higher of the rates will be used. We will use the most recent Index value available to us as of the date of the ANNUAL PERCENTAGE RATE adjustment. The Index is not necessarily the lowest rate charged by us on our loans. If the Index becomes unavailable during the term of the Credit Line Account, we may designate a substitute Index (and, if necessary, a new margin) after notice to you.

**A.    Rate Computation.** The ANNUAL PERCENTAGE RATE during the Draw Period is determined using the Index published as of the last business day prior to the first day of the next monthly Billing Statement plus a margin, as shown below, and will be effective on the first day of the next monthly billing cycle.

To determine the Periodic Rate that will apply during your Draw Period we add the margin shown below to the value of the Index and divide the value by the number of days in a year (daily). This result is the ANNUAL PERCENTAGE RATE for your Draw Period. To determine the Periodic Rate that will apply to your Repayment Period, we add the margin shown below to the value of the Index, then divide the value by the number of days in a year (daily). To obtain the ANNUAL

SANIYE F MUFTUOGLU
BANK OF AMERICA EQUITY MAXIMIZER AGREEMENT AND DISCLOSURE STATEMENT
USHEAG.BOA  09/12/05  005 DOCMAGIC, INC.                          Page 4 of 10

*DocMagic* 800-649-1362
www.docmagic.com

PERCENTAGE RATE we multiply the Periodic Rate by the number of days in a year (daily). This will result in the ANNUAL PERCENTAGE RATE for your Repayment Period. The ANNUAL PERCENTAGE RATE includes only interest and no other costs.

The current Index is   8 . 2 5 0   % per annum. The margin is   1 . 2 4 0   %. The initial Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE on your Credit Line Account are as stated below:

### Current Rates for the Draw Period

| Range of Balances or Conditions | Margin Added to Index | ANNUAL PERCENTAGE RATE | Daily Periodic Rate |
|---|---|---|---|
| ALL | 1.240% | 9.490% | 0.02600% |

### Current Rates for the Repayment Period

| Range of Balances or Conditions | Margin Added to Index | ANNUAL PERCENTAGE RATE | Daily Periodic Rate |
|---|---|---|---|
| ALL | .1.240% | 9.490% | 0.02600% |

**B.    Limits.** The Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE on your Credit Line Account will increase or decrease as the Index increases or decreases from time to time. There is no limit to the amount by which the ANNUAL PERCENTAGE RATE can increase or decrease over a 1-year period. Any increase in the Periodic Rate will take the form of higher payment amounts. Adjustments to the Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE resulting from changes in the Index will take effect monthly. In no event will the corresponding ANNUAL PERCENTAGE RATE be more than the lesser of 24.000% or the maximum rate allowed by applicable law.

Notwithstanding any other provision of this Agreement, we will not charge interest on any undisbursed loan proceeds, except as may be permitted during any Right of Rescission period.

**C.    Forgo Rate Increases.** If we forgo an ANNUAL PERCENTAGE RATE increase, at the time of a later adjustment we may return to the full Index value plus margin.

**14.    Closing Costs.** In addition to the FINANCE CHARGES which will be added to your Credit Line each billing cycle, you will pay the following fees, including real estate closing and security filing fees:

**15.    Other Charges.** You agree to pay the fees and charges listed below if the circumstances triggering their assessment apply. These fees and charges will be added to the Account balance and are payable as set forth in this Agreement.

**A.    Late Charge:** If we do not receive the amount of your minimum monthly payment in full within ten (10) days after your payment due date, you will pay us a late charge equal to the greater of $10.00 or five percent (5%) of the unpaid portion of your minimum monthly payment.

**B.    Returned Payment Charge:** If a check or any other instrument or payment method with which you have made a payment on the Credit Line Account is returned to us unpaid for any reason, you will be charged a return payment charge of $20.

**C.    Returned Special Convenience Check.** $20.

**D.    Annual Fee:** $0.

**E.    Fixed Rate Conversion Fee:** $0.

**F.    Security Instrument Discharge Fee:** As permitted by Applicable Law, Lender may request that at the time you payoff your Credit Line, you pay the Lender's cost to record a discharge of the Security Instrument.

**16.    Refund of Fees, Charges, and Costs.** The terms of this Agreement shall be construed to be consistent with Applicable Law. However, if a court of competent jurisdiction or other qualified authority determines that the loan charges and fees described in this Agreement exceed the limits that Applicable Law allows, the following shall occur. First, any such purportedly excessive charges or fees shall be reduced to the permitted amount. Second, any amounts collected that exceed the permitted amount will be returned to you, either by direct payment or by reducing the principal you owe on your Account. Your receipt of a refund made by direct payment to you or credited to your Account will constitute a waiver of any right of action you may have arising out of overcharges or allegedly excessive loan charges or fees.

**17.    Property Insurance; Other Charges.** You agree to obtain property insurance against loss or damage to the Property, in the amounts, for the time period and against the risks that the Security Instrument and/or we require. You may obtain insurance from an insurance carrier of your choice so long as the insurance carrier is acceptable to us. If you fail to purchase and maintain acceptable property insurance, we may purchase insurance for you or on your behalf and at your expense as

SANIYE F MUFTUOGLU /

BANK OF AMERICA EQUITY MAXIMIZER AGREEMENT AND DISCLOSURE STATEMENT
USHEAG.BOA  09/12/05  005 DOCMAGIC, INC.                                    Page 5 of 10                    DocMagic *eForms* 800-649-1362
                                                                                                            www.docmagic.com

described in the Security Instrument. We have no obligation to obtain such insurance. Should we take this action, the equity in the Property and contents thereof may not be protected as you desire. Further, the cost of the insurance may significantly exceed the cost of such insurance that you could have obtained; this cost will be treated as an Advance.

**18.** **Additional Rights and Remedies.** In addition to the rights described elsewhere in this Agreement and in the Security Instrument, we also have the following rights:

**A.** **Termination and Acceleration.** We can terminate your Account and require you to pay us the entire outstanding Account Balance under this Agreement in one payment, and charge you certain fees, if any of the following occur: 1) You engage in fraud or make a material misrepresentation at any time in connection with your Account; 2) We do not receive the full amount of any Minimum Payment due or you fail to meet any of the other repayment terms of this Agreement; 3) Your action or inaction adversely affects the Property or our rights in it (for this purpose, the words "you," "your," and "yours" also refer to the owner of the Property, if different than you). Examples of these actions or inactions include, but are not limited to: a) Your death, if you are the sole Borrower on the Account; or the death of all but one Borrower which adversely affects our security; b) Illegal use of the Property, if such use subjects the Property to seizure; c) You transfer all or part of your interest in the Property without our written consent; d) All or part of the Property is taken by condemnation or eminent domain; e) Foreclosure of any senior lien on the Property; f) Failure to maintain required insurance on the Property; g) Waste or destructive use of the Property which adversely affects our security; h) Failure to pay taxes or assessments on the Property; i) Permitting the creation of a senior lien on the Property; j) Filing of a judgment against you, if the amount of the judgment and collateral subject to the judgment is such that our security is adversely affected.

We may, at our option, take lesser action than those described in this Section. Such lesser action may include, without limitation, suspending your Account and not allowing you to obtain any further Advances, reducing your Credit Limit, and/or changing the payment terms on your Account. If we take any such action, this shall not constitute an election of remedies or a waiver of our right to exercise any rights or remedies under the remainder of this Section, the remaining provisions of this Agreement, the Security Instrument, or at law or in equity. We may take action under this Section only after complying with any notice or cure provisions required under Applicable Law. In the event we elect not to terminate the Account or take any lesser action as provided in this Section, we do not forfeit or waive our right to do so at a later time if any of the circumstances described above exists at that time.

**B.** **Suspension or Reduction.** We can refuse to make additional Advances or reduce your Credit Limit during any period of time in which any of the following are in effect: 1) The value of the Property declines significantly below the value as determined by us at the time you applied for your Account. This includes, for example, a decline such that the initial difference between the Credit Limit and the available equity in the Property is reduced by fifty percent (50%) or more, and may include a smaller decline depending on individual circumstances; 2) We reasonably believe you will not be able to meet the repayment requirements set forth in this Agreement due to a material change in your financial circumstances; 3) You are in default of a material obligation in this Agreement, including, without limitation, your failing to make a Minimum Payment on a date that it is due; 4) Government action prevents us from imposing the **ANNUAL PERCENTAGE RATE** provided for in this Agreement; 5) Government action impairs our security interest such that the value of our interest is less than 120 percent of your Credit Limit then in effect; 6) A regulatory agency which supervises us has notified us that continued Advances would constitute an unsafe and unsound practice; 7) The maximum **ANNUAL PERCENTAGE RATE** allowed under this Agreement is reached. If we refuse to make additional Advances or reduce your Credit Limit under this Section, we will send you a written notice stating the reason for such action. If, for any reason, you believe your ability to obtain Advances or your Credit Limit should be reinstated, you must send us a written request for reinstatement and include in the request the reasons why you believe your ability to obtain Advances or your Credit Limit should be reinstated.

**19.** **Collection Costs.** If you are in default and we require you to pay us immediately in full, we may also require that you pay our collection costs and expenses to the extent not prohibited by law. If we bring a lawsuit to collect, you will pay our attorneys' fees and court costs allowed by Applicable Law and set by the court.

**20.** **Suspension or Termination by You.** Each of you has the right, upon proper written notice to us, to suspend the privilege of obtaining new Advances. A request to suspend the privilege of obtaining Advances, even if made only by one of you, will be effective against all of you. Advances will be reinstated upon our receipt and acceptance of a written reinstatement request signed by each of you, provided that no event(s) permitting a suspension then exist.

To do so, you must notify us in writing. If one of you requests termination of the Account, the Account will be terminated for all of you. At our option, we may release some of you from liability under this Agreement and/or under Applicable Law without releasing all of you.

If you cancel your right to Advances under this Agreement, you must notify us and return all Special Convenience Checks and any other access devices. Any use of Special Convenience Checks or other access devices following suspension or termination may be considered fraud. You will also remain liable for any further use of the Special Convenience Checks or other Credit Line access devices not returned to us.

**21.** **Effect of Suspension of Your Account.** If your Account is suspended or terminated for any reason, you will nonetheless remain obligated to pay the Account Balance in accordance with the terms of this Agreement. Upon termination of your Account by either you or us, you must return to us all Checks, Credit Cards, or other Account access devices given to you. If either you or we terminate your Account, you will not be entitled to a refund of any **FINANCE CHARGES**, fees, charges, or credit insurance premiums paid or payable under the Account.

**22.** **Change in Terms.** After you open your Account, we may modify or amend the terms of this Agreement and/or the other loan documents pertaining to the Account if any of the following conditions exist: 1) You consent in writing to our proposed modification or amendment at that time; 2) The modification or amendment unequivocally benefits you throughout the remainder of the term of this Agreement; 3) The modification or amendment results only in an insignificant change to the terms of this Agreement and/or the other loan documents; 4) The modification or amendment involves the substitution of a new Index and Margin, as provided in Section 9 above. Any Account balance on the effective date of any modification or amendment is subject to the modification or amendment

**23.** **Prepayment.** You may prepay all or any amounts owing under this Credit Line at any time without penalty. However, we will be entitled to receive all accrued **FINANCE CHARGES** and any other accrued fees or charges.

**24.** **Tax Consequences.** You acknowledge that we (including our employees and representatives) have given you no assurances, representations or warranties that the **FINANCE CHARGES** and other fees and charges paid on your Account are tax deductible. You should consult your own tax advisor concerning the deductibility of the **FINANCE CHARGES** and other fees and charges for the Account.

**25.** **Review of Your Account.** Upon our request, you will provide us with current financial and credit information and will sign any additional or corrective documents in connection with this Agreement or the Account. You authorize us to release information about you to our affiliates or third parties as described in our privacy policy and our Fair Credit Reporting Act notice, provided you do not opt out of the applicable policy or as permitted by applicable law. You also authorize us to obtain credit reports on you at any time, at our sole option, and expense, for any reason, including but not limited to determining whether there has been an adverse change in your financial condition. We also may from time to time obtain a new valuation of the Property that secures the Credit Line at any time, including internal inspection, at our sole option and expense.

26.  **Use of the Credit Line.** You may use the Credit Line Account subject to the following limitations:

A.  **Legal Transactions.** Borrower agrees that Borrower will only use the Credit Line for transactions that are legal where Borrower resides. For example, Internet gambling transactions may be illegal in Borrower's state. Display by an on-line merchant of either Lender's logo or a Card Company's logo does not mean that an Internet transaction is legal where Borrower resides. Lender will not be liable if Borrower engages in an illegal transaction.

B.  **Authorizations.** Some transactions require lender's prior authorization. For security purposes, lender may from time to time place or change limits on the number or amounts of transactions Borrower makes in a day at ATMs or points-of-sale terminals. Such limitations may not be the same at every ATM or point-of-sale terminal. The limitations placed on a "Bank of America ATM Card" or "Bank of America Check Card" when using an ATM or point-of-sale terminal may not be the same as the limitations placed on an Account Access Card used at the same ATM or point-of-sale terminal. No such limits are placed on the number or amounts of transactions Borrower makes: at lender's banking centers, by writing a Special Convenience Check, by conducting an Overdraft Protection transaction (subject to the ATM limits, above), or by telephone. In addition, lender may deny authorization to any method of accessing the Credit Line if the Credit Line has been suspended or terminated or if Lender suspects fraudulent activity, lender shall not be liable for any failure to authorize a transaction for any of these reasons. However, Borrower is liable for any transaction Lender authorizes even if Lender should not have authorized it because Borrower is or would be in default as a result of the transaction.

C.  **No Security Interest on Purchases.** This Agreement does not grant Lender a security interest in purchases Borrower charges to the Credit Line.

D.  **Transactions With Merchants** (a) If a merchant discloses a policy such as "no returns", "no refund", "no return or credit without receipt", "as is", "store credit only", or "all sales final", or similar language, Borrower will be bound by that policy when Borrower uses the Credit Line to buy goods or services from that merchant. (b) When using the Credit Line to make travel or lodging reservations, Borrower must obtain the merchant's cancellation policy and follow it if Borrower cancels. If Borrower cancels, Borrower must obtain the cancellation number that the merchant is required to give Borrower. The merchant may charge Borrower for a cancelled transaction unless Borrower can provide Lender with a correct cancellation number. If Borrower makes reservations or purchases of any kind, such as lodging reservation for several nights stay or a mail order purchase, the Credit Line may be immediately charged for the full amount of the reservation or purchase, regardless whether Borrower has received the goods or services requested at the time the Credit Line is charged. (c) If Borrower authorizes a merchant to charge the Credit Line for repeat transactions without the Account Access Card, then Borrower must notify the merchant when Borrower wants to discontinue the repeat transactions or if the Credit Line is closed or if a new Credit Line or Account Access Card number is issued by Lender. Otherwise, Borrower will be responsible to Lender for the amount of all such repeat transactions. (d) If Borrower disagrees with a transaction on Borrower's statement or has a dispute with a merchant as a result of a transaction, Borrower will provide Lender with information or assistance Lender reasonably requests. Otherwise, Borrower will pay Lender for any resulting loss Lender has, unless Lender is prohibited by applicable law from holding Borrower liable for Lender's loss. (e) If Borrower makes a transaction in a currency other than U.S. dollars, Visa will convert the charge or credit into a U.S. dollar amount. The conversion rate will be determined using Visa currency conversion procedures that are disclosed to institutions issuing Visa cards. The conversion rate on the processing date may differ from the rate on the date of Borrower's transaction. Currently, Visa uses a currency conversion rate of either: (1) a rate selected by VISA from a range of rates available in the wholesale currency markets for the applicable central processing date, which rate may vary from the rate VISA itself receives or (2) the government mandated rate in effect for the central processing date. In each case, Visa uses the rate in effect one day before the conversion date. In the event Visa chooses to change the currency conversion rate or the day on which the currency conversion rate is determined, these transactions on the Credit Line made in a foreign currency and processed after the change will reflect the change.

E.  **Special Rule for Account Access Card Purchases.** If Borrower has a problem with the quality of goods or services that Borrower purchased with an Account Access Card, and Borrower has tried in good faith to correct the problem with the merchant, Borrower may not have to pay the remaining amount due on the goods or services. Borrower has this protection only when the purchase price was more than $50 and the purchase was made in Borrower's home state or within 100 miles of Borrower's mailing address. (If Lender owns or operates the merchant, or if Lender mailed Borrower the advertisement for the property or services, all purchases are covered regardless of amount or location of purchase.).

F.  **Overdraft Protection and Linked Accounts.** If the Credit Line Account is not blocked, suspended or terminated, you may request that the Credit Line Account be set up to provide overdraft protection for an associated checking or Money Market Savings account. If the total amount of checks, debit card or ATM transactions or other debits for a business day exceeds the available associated account balance, then an Advance will be made from the Credit Line Account ("Overdraft Protection"). If the Credit Line Account is used for Overdraft Protection, the minimum transfer amount is one hundred dollars ($100) and incremental transfer amounts will be in multiples of one hundred dollars ($100). However, if there is not $100 available, but the available Credit Line amount can cover the overdraft transaction, then the amount of the available Credit Line will be advanced to cover the overdraft. For Idaho and Washington, the incremental advance is $25. If the available credit on your Credit Line will not allow a $25 increment to be advanced, no transfer will be made. If the associated account is closed or blocked, Overdraft Protection will stop. If you request that the Credit Line Account be connected to or "linked" to another Bank of America product, you understand and agree that a user on the "linked" account can make a transaction that exceeds the available balance on the "linked" account and cause an Advance to be made. Also, if an ATM access card is given to a user on the "linked" account, that user when using the ATM access card may access the Credit Line Account and obtain an Advance without making a transaction directly on the "linked" account. That user may or may not be a party obligated for this Agreement.

G.  **Skip Payment Feature.** At our discretion, from time to time we may offer a feature that will allow you to skip one or more payments. FINANCE CHARGES will continue to accrue on the principal balance at the applicable interest rate. At the end of the skip payment period, the payment terms of this Agreement will be reinstated automatically without further notice.

27.  **Borrowers ProtectionPlan and Line Protection™ Plan** (Borrowers' ProtectionPlan and Line Protection™ Plan are registered trademarks of Bank of America Corporation). Fixed Rate Loan Options may be protected by the Borrowers' Protection Plan, and Variable Rate Balances that are not subject to a Fixed Rate Loan Option may be protected by the Line Protection™ Plan. Protection options for both plans include Disability, Involuntary Unemployment, and Accidental Death; or Disability and Accidental Death; or Involuntary Unemployment and Accidental Death. Borrowers' ProtectionPlan and Line Protection™ Plan are optional and are not required to obtain a Credit Line. For each new Credit Line, you must specifically request Borrowers' ProtectionPlan or Line Protection™ Plan. In addition, you must sign a separate Addendum to your Credit Line Agreement, even if you obtained Borrowers' ProtectionPlan or Line Protection™ Plan for a prior Credit Line Agreement with Bank of America. Two Borrowers may purchase Protection for each Fixed Rate Loan Option, but they must select the same protection option, and there may be restrictions on which Borrowers may apply.

Fees for the Borrowers' ProtectionPlan and Line Protection™ Plan are based on and payable with the regularly scheduled monthly payment of the Credit Line Agreement. Credit Line Agreements repaid in quarterly payments are not eligible for the Borrowers' ProtectionPlan. Interest is not charged on the fees for Borrowers' ProtectionPlan or Line Protection™ Plan.

The maximum term of the Borrowers' ProtectionPlan is the shorter of the Credit Line Agreement term or 120 months.

We may allow you to exceed the Credit Limit temporarily and from time to time, to accommodate the premiums for any voluntary insurance or the fees for Borrowers' ProtectionPlan or Line Protection™ Plan.

There are eligibility requirements, conditions and exclusions that can prevent you from receiving benefits under the Borrowers' Protection Plan or Line Protection™ Plan as set forth in the Addendum describing the plan.

**28.    Miscellaneous.** If this Agreement represents a renewal, modification, extension, substitution or consolidation of an obligation owed to us, then you acknowledge and agree that there are no claims, setoffs, avoidances, counterclaims or defenses or rights to claims, setoffs, avoidances, counterclaims or defenses to payment or enforcement of the prior obligation. If this Agreement is a renewal of a prior note or agreement with you, then it is the intent of the parties that the note or Agreement evidencing the original extension of credit not be extinguished by the renewal unless required by applicable state law. Our records shall be evidence that this Agreement is a renewal.

You agree that if this Agreement is in default, including the failure to make a Minimum Payment by the due date, you will accept calls regarding the collection of this Agreement at any residence or place of employment. The calls can be automatically dialed and a recorded message may be played. You agree such calls will not be "unsolicited calls" for purposes of any federal, state or local law. To improve customer service and security our calls with you may be recorded. You agree that monitoring or recording may be done and that no additional notice to you or additional approval from you is needed. You authorize us, our parent company, Bank of America Corporation (or any successor company) and Bank of America Corporation's affiliates and subsidiaries ("Affiliates") to: (a) obtain other information deemed necessary concerning your credit experience and other information from credit reporting agencies, creditors, and any department of motor vehicle or similar state agency, your employer (past, present and future) and other persons (and all entities may release and/or verify such information to us at any time without notification to you or without your consent), and (b) share information with our Affiliates, except to the extent that you have opted out of such sharing as provided in our Privacy Policy for consumers.

**29.    Entire Understanding.** This Agreement together with the Security Instrument constitutes the entire understanding and agreement between the parties as to the matters set forth in this Agreement and the Security Instrument and supercede all prior understanding and correspondences, written or oral, with respect to the subject hereof.

**30.    Delay in Enforcement.** We reserve the right to defer or delay the date certain changes are to occur without notice and without being liable for such delay or deferment. A court decree for divorce or separation or no-court approved mutual agreement does not affect, eliminate or reduce any person's liability for the Agreement or the Account balance if we are not a party to the decree or agreement.

**31.    Governing Law.** In addition to applicable federal law, this Agreement will be governed by and interpreted in accordance with federal law and the laws of the State of N E W    J E R S E Y                , except for matters related to the exportation of interest (as defined by federal law) which will be governed by and interpreted in accordance with the laws of the State of North Carolina. However, if there ever is a question about whether any provision of this Agreement is valid or enforceable, the provision that is questioned will be governed by whichever state or federal law would find the provision to be valid and enforceable. The loan transaction, which is evidenced by the Credit Agreement and this Agreement has been approved, made, and funded, and all necessary loan documents have been accepted by us in the State of North Carolina.

**32.    Severability.** If any portion of this Agreement conflicts with, contradicts or otherwise controverts applicable federal, state, tribal, or local law, then to the extent possible such portion shall be construed as being consistent with such Applicable Law, and further will be deemed changed to the extent necessary to accomplish this end. If any such conflicting or contradicting portion of this Agreement cannot be so construed or changed, it will be deemed severed from this Agreement and will not affect other provisions of this Agreement, which shall be given full effect without regard to the conflicting or contradicting portions.

**33.    Irregular Payments.** We may accept late payments, partial payments, and items marked "payment in full" even if they are not full payments, without losing any of our rights under this Agreement, and you will remain obligated to pay amounts owed under this Agreement. All written communications concerning disputed amounts including any checks or other instruments that indicate a payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations as full satisfaction of a disputed amount must be mailed or delivered to us at the address shown on your periodic statement.

**34.    Waiver of Notice.** Subject to Applicable Law, you waive presentment for payment, demand, protest, and notice of dishonor, notice of acceleration, notice of intent to accelerate, and notice of nonpayment.

**35.    Sending of Notices.** Except as otherwise provided in this Agreement, all notices must be in writing. Notice to any of you shall be deemed notice to all of you. Any Billing Statement or notice to you under this Agreement will be sufficiently given if sent to your address on file in connection with the Account or to a new address of which you have notified us in writing at least 20 calendar days before the sending of the Billing Statement or notice. Any notice that you give to us must be provided to us at the address listed on page 1, or a different address if you are notified of the same.

**36.    Transfer and Assignment.** We may transfer or assign this Credit Line Agreement, the Security Instrument and any other loan document relating to the Account to any person or entity without notice to you. You may not transfer, assign or delegate your duties under this Agreement. Subject to applicable law this Agreement is binding on you, your successors, heirs and personal and legal representatives.

**37.    Assumption.** This Account is not assumable. This means that someone buying the Property may not take over this Account as his/her own obligation on the terms of this Agreement or on any other terms.

**38.    Caption Headings.** Caption headings are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

SANIYE F MUFTUOGLU
BANK OF AMERICA EQUITY MAXIMIZER AGREEMENT AND DISCLOSURE STATEMENT
USHEAG.BOA   09/12/05   005 DOCMAGIC, INC.                                   Page 8 of 10

DocMagic *Ɛ*Ɛɾ*ɱɱ*ɒɜɜ 800-649-1362
www.docmagic.com

**Acknowledgement.** You understand and agree to the terms and conditions of this Agreement. By signing this Agreement, you acknowledge that you have read this Agreement. You also acknowledge receipt of a completed copy of this Agreement, including the Fair Credit Billing Notice and the early home equity line of credit application disclosure, in addition to the handbook entitled *When Your Home is On the Line: What You Should Know About Home Equity Lines of Credit* provided to you at application.

WITNESS:  ACCEPTED AND AGREED TO:

| | |
|---|---|
| Borrower  SANIYE  F  MUFTUOGLU          Date | Borrower                    Date |
| | |
| Borrower          Date | Borrower          Date |
| | |
| Borrower          Date | Borrower          Date |

PAY TO THE ORDER OF

WITHOUT RECOURSE
BANK OF AMERICA, N.A.

BY _____
Fred S Martinez
ASSISTANT VICE PRESIDENT

SANIYE  F  MUFTUOGLU/
BANK OF AMERICA EQUITY MAXIMIZER AGREEMENT AND DISCLOSURE STATEMENT
USHEAG.BOA  09/12/05  005 DOCMAGIC, INC.                    Page 9 of 10

DocMagic *eForms* 800-649-1362
www.docmagic.com

# BILLING ERROR RIGHTS
## YOUR BILLING RIGHTS

## KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

### NOTIFY US IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR BILL

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet at the address listed on your bill. Write to us as soon as possible. We must hear from you no later that sixty (60) days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter give us the following information:

Your name and account number;

The dollar amount of the suspected error;

Describe the error and explain, if you can, why you believe there was an error. If you need more information, describe the item you think is wrong.

### YOUR RIGHTS AND RESPONSIBILITIES AFTER WE RECEIVE YOUR WRITTEN NOTICE

We must acknowledge your letter within thirty (30) days, unless we have corrected the error by then. Within ninety (90) days, we must either correct the error or explain why we believe the bill is correct.

After we receive your letter, we cannot try and collect any amount you question, or report you as delinquent. We can continue to bill you for the amount in question, including FINANCE CHARGES, and we can apply any unpaid amount against your Credit Line. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find we made a mistake on your bill, you will not have to pay FINANCE CHARGES related to any questioned amount. If we didn't make a mistake, you may have to pay FINANCE CHARGES, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date on which it is due.

If you fail to pay us the amount that we think you owe, we may report you as delinquent. However, if your explanation does not satisfy us and you write to us within ten (10) days telling us that you still refuse to pay, we will tell anyone we report you to that you have a question about your bill. And, we must tell you the name of anyone we reported you to. We must tell anyone that we report you to that the matter has been settled between us when it finally is.

If we do not follow these rules, we can't collect the first $50 of the questioned amount, even if your bill is correct.

SANIYE F MUFTUOGLU/

BANK OF AMERICA EQUITY MAXIMIZER AGREEMENT AND DISCLOSURE STATEMENT
USHEAG.BOA  09/12/05  005 DOCMAGIC, INC.                           Page 10 of 10

DocMagic *eForms* 800-649-1362
www.docmagic.com

Muftuoglu, Saniye F

**Record and Return To:**
**Fiserv Lending Solutions**
**27 Inwood Road**
**ROCKY HILL, CT 06067**

**2007046227**

This Instrument Prepared By:
Bank of America, NA
100 North Tryon Street
Charlotte NC 28255

BRETT A RADI COUNTY CLERK
SOMERSET COUNTY, NJ
2007 AUG 06 02.27.00 PM
BK.6054 PG.868-870
INSTRUMENT # 2007046227

———————— [Space Above This Line For Recording Data] ————————

# MORTGAGE

## DEFINITIONS

**(A)  "Security Instrument"** means this document, which is dated    JULY 20, 2007    , together
with all Riders to this document.
**(B)  "Borrower"** is SANIYE F MUFTUOGLU

the party or parties who have signed this Security Instrument.
Borrower is the Mortgagor under this Security Instrument.
**(C)  "Lender"** is   Bank of America, NA

Lender is a   National Banking Association                                    organized
and existing under the laws of   THE UNITED STATES OF AMERICA
Lender's address is   100 North Tryon Street, Charlotte, North Carolina
28255

Lender is the Mortgagee under this Security Instrument.
**(D)  "Agreement"** means the Home Equity Line of Credit Agreement signed by the Borrowers.
**(E)  "Account"** means the Home Equity Line of Credit Account pursuant to which the Lender makes Advances to
the Borrower at the Borrower's direction, allowing the Borrower to repay those Advances and take additional
Advances, subject to the terms of the Agreement.
**(F)  "Credit Limit"** means the maximum aggregate amount of principal that may be secured by this Security
Instrument at any one time.  The Credit Limit is   $64,000.00                    .  Except to the extent
prohibited by Applicable Law, the Credit Limit does not apply to interest, Finance Charges, and other fees and
charges validly incurred by Borrower under the Agreement and this Security Instrument.  The Credit Limit also does
not apply to other advances made under the terms of this Security Instrument to protect Lender's security and to
perform any of the covenants contained in this Security Instrument.
**(G)  "Account Balance"** is the total unpaid principal of the Account, plus earned but unpaid Finance Charges,
outstanding fees, charges, and costs.
**(H)  "Maturity Date"** is the date on which the entire Account Balance under the Agreement is due.  The entire
Account Balance on your Account, as defined in the Agreement and this Security Instrument, is due on
JULY 20, 2032          .
**(I)   "Property"** means the Property that is described below under the heading "Transfer of Rights in the Property."

SANIYE F MUFTUOGLU

NEW JERSEY HOME EQUITY LINE OF CREDIT MORTGAGE
NJHESI HLC 10/10/06                                                Page 1 of 12                                    DocMagic *eFormss* 800-649-1362
                                                                                                                  www.docmagic.com

(J) **"Secured Debt"** means:

    (1)  All amounts due under your Account, including principal, interest, Finance Charges, and other fees, charges, and costs incurred under the terms of this Security Instrument and all extensions, modifications, substitutions or renewals thereof.

    (2)  Any advances made and expenses incurred by Lender under the terms of this Security Instrument.

(K)  **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ 1-4 Family        ☐ Condominium Rider        ☐ Escrow Rider
☐ Second Home    ☐ Planned Unit Development Rider    ☐ Mortgage Insurance Rider
☐ Other(s)

(L)  **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(M)  **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(N)  **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(O)  **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(P)  **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Agreement and/or this Security Instrument.

(Q)  **"Approved Prior Loan"** means a lien which is and which lender acknowledges and agrees will continue to have priority over the lien created by this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For these purposes, Borrower does hereby mortgage, grant and convey to Lender the following described property located in the

           COUNTY            of            SOMERSET
    [Type of Recording Jurisdiction]            [Name of Recording Jurisdiction]
                                              OF.

Being the same property conveyed and described in a Deed recorded among the land records of the County set forth above:

Deed recorded in BOOK _____5894_____ PAGE _____522_____

SANIYE F MUFTUOGLU/
NEW JERSEY HOME EQUITY LINE OF CREDIT MORTGAGE
NJHESI.HLC 10/10/06                     Page 2 of 12               DocMagic *eForms* 800-649-1362
                                                               www.docmagic.com

which currently has the address of      295 GEMINI DR UNIT 3B
                                                              [Street]

HILLSBOROUGH TWP          NEW JERSEY              088444976      ("Property Address"):
        [City]                    [State]                       [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

ADVANCES. During the Draw Period described in the Agreement, the Borrower may repeatedly take and repay any advances that Lender makes to Borrower under the terms of the Agreement and this Security Instrument, subject to the terms that the Agreement and this Security Instrument impose. The Agreement and this Security Instrument will remain in full force and effect notwithstanding that the Account Balance under the Agreement may occasionally be reduced to an amount of equal to or less than zero.

Any amounts that Lender advances to Borrower in excess of the Credit Limit will be secured by the terms of this Security Instrument unless applicable law prohibits the same. Lender shall not be obligated to increase the Credit Limit formally or to make additional Advances in excess of the Credit Limit stated in the Agreement even though the Credit Limit has been exceeded one or more times. The Draw Period may or may not be followed by a Repayment Period, as described in the Agreement, during which additional Advances are not available. During both the Draw Period and the Repayment Period the Lender may, at its option, make Advances from the Account to pay fees, charges, or credit insurance premiums due under the Agreement or this Security Instrument, or make other Advances as allowed by this Security Instrument.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

**UNIFORM COVENANTS.**        Borrower and Lender covenant and agree as follows:

**1.    Payment of Secured Debt.** Borrower shall pay when due all Secured Debt in accordance with the Agreement and this Security Instrument. All payments shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Agreement or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Agreement or Security Instrument be by a method of Lender's choosing. These methods include, but are not limited to: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Billing Statement or at such other location as may be designated by Lender in accordance with the notice provisions provided in Section 15. Lender may return any payment or partial payment if the payment or partial payment are insufficient to bring the Account current. Lender may accept any payment or partial payment insufficient to bring the Account current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Agreement and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2.    Application of Payments or Proceeds.** All payments accepted by Lender shall be applied to the Secured Debt under this Security Instrument as provided in the Agreement unless Applicable Law provides otherwise. Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Agreement shall not extend or postpone the due date, or change the amount, of the Minimum Payment.

**3.    Funds for Escrow Items.** Borrower shall not be required to pay into escrow amounts due for taxes, assessments, leasehold payments, or other insurance premiums unless otherwise agreed in a separate writing.

SANIYE F MUFTUOGLU
NEW JERSEY HOME EQUITY LINE OF CREDIT MORTGAGE                    Page 3 of 12                    DocMagic *eFarms* 800-649-1362
NJHESI.HLC  10/10/06                                                                               www.docmagic.com

**4.   Charges; Liens; Prior Security Interests.**  Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in a manner provided in Section 3.

Borrower shall promptly discharge any lien, other than the Approved Prior Loan, which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, other than the Approved Prior Loan, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth in this Section.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with the Agreement. Borrower shall pay when due, or shall cause to be paid when due, all sums required under the loan documents evidencing the Approved Prior Loan and shall perform or cause to be performed all of the covenants and agreements of Borrower or the obligor set forth in such loan documents. All of Lender's rights under this Covenant shall be subject to the rights of the Holder of the Approved Prior Loan.

**5.   Property Insurance.**  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Agreement. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section shall become additional Secured Debt of Borrower and secured by this Security Instrument. These amounts shall be subject to the terms of the Agreement and the Security Instrument.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgagee clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgagee clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Agreement up to the amount of the outstanding Agreement Account Balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened.

During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the Secured Debt secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Agreement or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Agreement or this Security Instrument, whether or not then due.

**6.    Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of the Agreement and Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7.    Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower resides on the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8.    Borrower's Home Equity Line of Credit Application Process; Default.** Borrower shall be in default if, during the Account application process, or at any time during the term of the Agreement, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Account. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

Borrower is also in default if: 1) Borrower engages in fraud or makes a material misrepresentation at any time in connection with Borrower's Account; 2) Lender does not receive the full amount of any Minimum Payment due or Borrower fails to meet any of the other repayment terms of the Agreement; 3) Borrower's action or inaction adversely affects the Property or Lender's rights in it. Examples of these actions or inactions include, but are not limited to: a) Borrower's's death, if Borrower is the sole person on the Account; or the death of all but one borrower which adversely affects Lender's security; b) Illegal use of the Property, if such use subjects the Property to seizure; c) Transfer of all or part of the Borrower's interest in the Property without Lender's written consent; d) All or part

SANIYE F MUFTUOGLU
NEW JERSEY HOME EQUITY LINE OF CREDIT MORTGAGE
NJHESI HLC  10/10/06                                    Page 5 of 12                          DocMagic *eProvision* 800-649-1362
www.docmagic.com

of the Property is taken by condemnation or eminent domain; e) Foreclosure of any senior lien on the Property; f) Failure to maintain required insurance on the Property; g) Waste or destructive use of the Property which adversely affects Lender's security; h) Failure to pay taxes or assessments on the Property; i) Permitting the creation of a senior lien on the Property other than an Approved Prior Loan; j) Filing of a judgment against Borrower, if the amount of the judgment and collateral subject to the judgment is such that Lender's security is adversely affected.

Lender may, at its option, take lesser actions than those described at the beginning of this Section. Such lesser actions may include, without limitation, suspending Borrower's Account and not allowing Borrower to obtain any further Advances, reducing Borrower's Credit Limit, and/or changing the payment terms on Borrower's Account. If Lender takes any such actions, this shall not constitute an election of remedies or a waiver of Lender's right to exercise any rights or at law or in equity. Lender may take action under this Section only after complying with any notice or cure provisions required under Applicable Law. In the event Lender elects not to terminate the Account or take any lesser action as provided in this Section, Lender does not forfeit or waive its right to do so at a later time if any of the circumstances described above exists at that time.

9.   **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any Secured Debt secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Lender may without notice, perform or cause to be performed any covenant of Borrower in this Security Instrument, and Borrower appoints Lender as attorney in fact to sign Borrower's name. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take this action, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section.

Any amounts disbursed by Lender under this Section shall become additional Secured Debt of Borrower secured by this Security Instrument, payable according to the terms of the Agreement and this Security Instrument. These amounts shall bear interest at the Agreement rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment. If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10.   **Mortgage Insurance.** Borrower is not required to obtain Mortgage Insurance unless otherwise agreed in writing.

11.   **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or

Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the Secured Debt secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in the Agreement and this Security Instrument.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the Secured Debt secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the Secured Debt secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Secured Debt secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the Secured Debt immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the Secured Debt immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the Secured Debt secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, and Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the Secured Debt secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be otherwise applied in the order provided for in Section 2.

   **12.   Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the Secured Debt secured by this Security Instrument granted by Lender to Borrower or any Successors in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

   **13.   Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Agreement (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the Secured Debt secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Agreement without the co-signer's consent.

SANIYE F MUFTUOGLU
NEW JERSEY HOME EQUITY LINE OF CREDIT MORTGAGE
NJHESI HLC  10/10/06                                                Page 7 of 12                         DocMagic *eFormos* 800.649.1352
www.docmagic.com

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender.

14. **Agreement/Account Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Account is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other Account charges collected or to be collected in connection with the Account exceed the permitted limits, then: (a) any such Account charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Agreement or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Agreement). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Agreement conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Agreement which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Agreement and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent,

Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender or causes Lender to be paid all sums which then would be due under this Security Instrument and the Agreement as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the Secured Debt secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Change of Servicer; Notice of Grievance.** The Agreement or a partial interest in the Agreement (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Servicer") that collects the amounts due under the Agreement and this Security Instrument and performs other mortgage loan servicing obligations under the Agreement, this Security Instrument, and Applicable Law. There also might be one or more changes of the Servicer unrelated to a sale of the Agreement. If the Agreement is sold and thereafter the Agreement is serviced by a Servicer other than the purchaser of the Agreement, the servicing obligations to Borrower will remain with the Servicer or be transferred to a successor Servicer and are not assumed by the Agreement purchaser unless otherwise provided.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party and allowed the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and reasonable time to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else

SANIYE F MUFTUOGLU
NEW JERSEY HOME EQUITY LINE OF CREDIT MORTGAGE
NJHESI.HLC 10/10/06

DocMagic *EForms* 800-649-1362
www.docmagic.com

to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice as required by Applicable Law prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument or the Agreement (but not prior to acceleration under Section 18 of the Security Instrument unless Applicable Law provides otherwise), Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Release.** Upon Borrower's request, and upon payment in full of all sums secured by this Security Instrument, Lender shall cancel this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. No Claim of Credit for Taxes.** Borrower will not make deduction from or claim credit on the principal or interest secured by this Security Instrument by reason of any governmental taxes, assessments or charges. Borrower will not claim any deduction from the taxable value of the Property by reason of this Security Instrument.

**25. Future Advances Secured.** This Security Instrument is intended to secure future advances made pursuant to Section 46:9-8 et seq. of the New Jersey Statutes.

**26. Purchase Money Mortgage.** If any debt secured by this Security Instrument is lent to Borrower to acquire title to the Property, this Security Instrument shall be a purchase money mortgage.

SANIYE F MUFTUOGLU
NEW JERSEY HOME EQUITY LINE OF CREDIT MORTGAGE
NJHESI HLC 10/10/06

Page 10 of 12

DocMagic *℮Pσφσπος: 800.649-1362*
www.docmagic.com

**MORTGAGEE REQUESTS NOTICE OF ANY ADVERSE ACTION
THAT A PRIORITY LIEN HOLDER TAKES WITH REGARD TO
THE PROPERTY, INCLUDING DEFAULT AND FORECLOSURE**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)          _____ (Seal)
SANIYE F MUFTUOGLU        -Borrower                                -Borrower

_____ (Seal)          _____ (Seal)
                          -Borrower                                -Borrower

_____ (Seal)          _____ (Seal)
                          -Borrower                                -Borrower

Witness:                                 Witness:

_____                  _____

SANIYE  F  MUFTUOGLU
NEW JERSEY HOME EQUITY LINE OF CREDIT MORTGAGE
NJHESI HLC  10/10/06                     Page 11 of 12          DocMagic *eFormixx* 800-649-1362
                                                                www.docmagic.com

[Space Below This Line For Acknowledgment]

State of New Jersey,

County of SOMERSET _____ , ss

I CERTIFY that on   7/20/2007   SANIYE F MUFTUOGLU

personally came before me and stated to my satisfaction that this person (or if more than one, each person):
(a)   was the maker of the attached instrument; and
(b)   executed this instrument as his or her own act.

_____   7/20/07
Notary's Signature                        Date

RAJPREET SARAN
Notary's printed or typed name

My commission expires: _____

RAJPREET SARAN
NOTARY PUBLIC
STATE OF NEW JERSEY
MY COMMISSION EXPIRES SEPTEMBER 28, 2011

SANIYE F MUFTUOGLU
NEW JERSEY HOME EQUITY LINE OF CREDIT MORTGAGE
NJHESLHLC  10/10/06                   Page 12 of 12

DocMagic *E Forms* 800-649-1362
www.docmagic.com



BRETT A. RADI
SOMERSET COUNTY CLERK
20 GROVE STREET
P.O. BOX 3000
SOMERVILLE, NJ 08876-1262

**************************************************************************************************

| | |
|---|---|
| Recorded: | 08/06/2007 02:27:00 PM |
| Book: | OPR  6054  Page:  858-870 |
| Instrument No.: | 2007046227 |
| | MTG   13 PGS   $140.00 |

Recorder:    **HECKMAN**

**************************************************************************************************

# DO NOT DISCARD

*2007046227*



**SOMERSET COUNTY**

**DOCUMENT COVER SHEET**

Steve Peter, County Clerk
**Electronically Recorded Somerset County, NJ**
2019 Nov 14 09:45:21 AM
BK: 7167 PGS: 551-552
Instrument # 2019043906

| Fee: | $50.00 | Doc Type: ASSIGNM |

HON. STEVE PETER
SOMERSET COUNTY CLERK
PO BOX 3000
20 GROVE STREET
SOMERVILLE, NJ 08876

WWW.CO.SOMERSET.NJ.US

*(Official Use Only)*

---

| DATE OF DOCUMENT: 2019-11-14 | TYPE OF DOCUMENT: ASSIGNMENT OF MORTGAGE |
|---|---|
| FIRST PARTY *(Grantor, Mortgagor, Seller or Assignor)* | SECOND PARTY *(Grantee, Mortgagee, Buyer, Assignee)* |
| BANK OF AMERICA, NA | MEB LOAN TRUST IV |
| ADDITIONAL PARTIES: | |
| SANIYE F MUFTUOGLU | |

---

| THE FOLLOWING SECTION IS REQUIRED FOR DEEDS ONLY | |
|---|---|
| MUNICIPALITY: Hillsborough | MAILING ADDRESS OF GRANTEE: |
| BLOCK: | |
| LOT: | |
| CONSIDERATION: | |

---

**THE FOLLOWING SECTION IS FOR ORIGINAL MORTGAGE BOOKING & PAGING INFORMATION FOR ASSIGNMENTS, RELEASES, SATISFACTIONS, DISCHARGES & OTHER ORIGINAL MORTGAGE AGREEMENTS ONLY**

| BOOK | PAGE | INSTRUMENT # | DOCUMENT TYPE |
|---|---|---|---|
| 6054 | 858 | 2007046227 | ASSIGNMENT OF MORTGAGE |

---

**DO NOT REMOVE THIS PAGE**
**THIS DOCUMENT COVER SHEET IS PART OF THE SOMERSET COUNTY FILING RECORD**
**RETAIN THIS PAGE FOR FUTURE REFERENCE**

This Instrument Prepared By:
**TIA LABADIE**
**COMPUTERSHARE TITLE SERVICES**
c/o VISIONET SYSTEMS INC.
After Recording Return To:
**COMPUTERSHARE TITLE SERVICES**
c/o VISIONET SYSTEMS INC.
**183 INDUSTRY DRIVE**
**PITTSBURGH, PA 15275**
Voice: 1-(412) 927-0226

## Assignment of Mortgage

For value received, the undersigned, hereby grants, assigns, and transfers to: **MEB Loan Trust IV** all beneficial interest under that certain Mortgage dated July 20, 2007 executed by:

Borrower: SANIYE F MUFTUOGLU

For Bank of America, NA, whose address is 100 North Tryon Street, Charlotte, North Carolina 28255 in the amount of: $64,000.00, recorded 08/06/2007 as Instrument No.: 2007046227 in Book/Volume: 6054 Page: 858 of the Official Records of Somerset County, New Jersey

Property Address: 295 GEMINI DR UNIT 3B, HILLSBOROUGH TWP, NEW JERSEY 08844-4976

**Legal Description**
BEING THE SAME PROPERTY CONVEYED AND DESCRIBED IN A DEED RECORDED AMONG THE LAND RECORDS OF THE COUNTY SET FORTH ABOVE:
DEED RECORDED IN 5894 PAGE 522

Effective date: **NOV 1 1 2019**

**Bank of America, NA**
By Specialized Loan Servicing LLC, as Attorney in Fact

By: _____
**SCOTT SLAGLE**
**ASSISTANT VICE PRESIDENT**

State of **PENNSYLVANIA**
County of **ALLEGHENY**

On **NOV 1 1 2019** before me, Tina M Darick the undersigned, a Notary Public in and for the county of ALLEGHENY in the State of Pennsylvania, personally appeared Scott Slagle, ASSISTANT VICE PRESIDENT personally known to me to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that for his/her signature on the instrument the person, or the entity upon behalf of which he/she acted, executed the instrument.

_____
**Tina M Darick**
My Commission Expires: 02/10/2021

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
TINA M DARICK
Notary Public
FINDLEY TWP, ALLEGHENY COUNTY
My Commission Expires Feb 10, 2021